# IN THE SUPREME COURT OF IOWA

No. 07–1041

Filed February 13, 2009

**STATE OF IOWA,**

    Appellee,

vs.

**JEFFREY D. SMITH,**

    Appellant.

Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar, Judge.

Defendant charged with first-degree murder appeals from the district court's order disqualifying his counsel of choice. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Robert P. Montgomery of Parrish, Kruidenier, Dunn, Boles, Gribble, Cook, Parrish, Gentry & Fisher, L.L.P., Des Moines, and Michael Lanigan, Waterloo, for appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Charity McDonell, Assistant County Attorney, for appellee.

**HECHT, Justice.**

The State moved to disqualify defendant's privately-retained counsel of choice on the ground that counsel faced an "actual conflict of interest." Despite the defendant's express waiver of the conflict, and notwithstanding the availability of co-counsel to handle all matters related to the State's witness whose involvement in the case was the subject of the claimed conflict, the district court ordered counsel to withdraw. We stayed further proceedings in the district court and granted interlocutory discretionary review of the order disqualifying the defendant's counsel. We now reverse and remand with instructions.

## I.     Factual and Procedural Background.

Tonyeah Jackson was murdered at a Waterloo bar in July of 2006. Waterloo police identified the defendant, Jeffrey Smith, as a prime suspect in the murder. On July 10, Smith met with Attorney Robert Montgomery of Parrish, Kruidenier, Dunn, Boles, Gribble, Cook, Parrish, Gentry & Fisher, L.L.P. (Parrish Firm) in Des Moines. Montgomery advised Smith to voluntarily turn himself in to the police, and Smith complied. Smith was initially charged with a drug offense, and he hired Montgomery to represent him.

On August 3, 2006, Smith was charged with first-degree murder in connection with the Jackson homicide. He hired Montgomery to represent him on this new charge, as well.[1] Montgomery appeared with Smith at the arraignment on the murder charge, and was given a copy of the trial information. A list of potential witnesses for the State and

---

[1]Montgomery's disqualification from representation of Smith on the murder charge gives rise to this appeal. Montgomery's representation of Smith on the drug-related charge continued and is unrelated to this appeal.

minutes of testimony were not attached to or provided with the information delivered to Montgomery and Smith at the arraignment.[2]

After making a formal appearance as Smith's counsel on the murder charge, Montgomery filed an application for the appointment of a court-appointed co-counsel to assist in Smith's defense. The court appointed attorney Mike Lanigan of Waterloo to serve as Montgomery's co-counsel. Montgomery and Lanigan had no personal or professional association prior to their mutual representation of Smith in this case.

Montgomery traveled to the clerk of court's office in Waterloo on a number of subsequent occasions and reviewed the State's list of witnesses, consisting of approximately one hundred names, and the minutes of testimony. While reviewing the State's witness list in December 2006, Montgomery discovered Marlon Earsery was among the persons named on the State's list of potential witnesses. Earsery was at that time represented by Eric Parrish, Montgomery's colleague in the Parrish Firm, on an unrelated criminal charge.

The minutes of testimony revealed the State planned to call Earsery to testify about two tape-recorded telephone conversations he had with Shylandra Dunn, his girlfriend, and Larhandrae Dunn, her brother.[3] The original minutes of testimony summarized Earsery's expected testimony as follows:

> [Earsery] will testify and identify and introduce into evidence a recording from the jail pod with Shylandra Dunn and Larhandrae Bud Dunn. [Earsery] will testify and identify his voice and those voices on said conversation. [Earsery] will

[2]The record suggests it is customary in Black Hawk County for the initial witness lists and minutes of testimony to be placed in boxes at the clerk of court's office in Waterloo. Thus, defendants and their counsel do not customarily receive documents communicating such information at the time of their arraignment in that county.

[3]Earsery was an inmate in the county jail at the time, and his phone calls were tape-recorded consistent with the procedures used on all inmate calls originating from the jail.

testify and describe the events as they transpired during the phone conversation, mainly hearing shots and to Bud Dunn telling him that J-Rich just came in and started shooting up Crystyles. [Earsery] will further testify, identify, and introduce into evidence said recorded phone call from the jail. [Earsery] will testify and identify the voices on it. [Earsery] will testify to the nature of the conversations. [Earsery] will testify as to the shots being recorded.

After learning Earsery was represented by Parrish, Montgomery immediately discussed the matter with Lanigan. Montgomery and Lanigan again reviewed the minutes of testimony and concluded Earsery's role as a witness would be to provide foundational testimony supporting the introduction of the audiotape in evidence.[4] Their understanding of Earsery's expected role as a witness was corroborated in conversations with the prosecuting attorneys who suggested they saw no actual conflict presented by Montgomery's continued representation of Smith.

Montgomery and Lanigan believed Earsery's expected testimony would not be accusatory in nature because Earsery was not present at the scene of the crime, and therefore had no personal knowledge of the matter. Neither Montgomery nor Lanigan anticipated a need to impeach Earsery's foundational testimony through cross-examination.

Even after concluding Earsery's testimony was solely foundational, Montgomery took various cautionary steps to ensure the situation would not develop into an actual conflict. First, Montgomery and Lanigan agreed Montgomery would not participate in deposing nor questioning

---

[4]Contemporaneous discussions between Smith's attorneys and the county prosecutors concerning Earsery after discovering the potential conflict substantiated the conclusion that Earsery would serve a purely foundational role. The prosecutors indicated to Smith's attorneys they saw no actual conflict presented by Montgomery's continued representation of Smith. The prosecutors remained steadfast in this position until the time of the "*Watson* hearing." At the hearing, the prosecutors argued Earsery would be a "key witness" contrary to their earlier assertions and contrary to the language of the minutes. Our full review of the record yields no support for the State's assertion Earsery's testimony would be more than foundational.

Earsery should either later become necessary. Lanigan would handle those duties.[5] Additionally, Montgomery took steps within the Parrish Firm to avoid all contact with Earsery's defense. Montgomery gained no knowledge of Earsery's client confidences, and he never discussed Earsery's case or Smith's case with Parrish.

Having fully disclosed the situation to Lanigan and to the prosecutors, Montgomery proceeded as lead counsel from the time he was hired in September 2006 until May 2007 on the understanding that no actual conflict existed which would require his voluntary withdrawal or his involuntary disqualification. During that time, Montgomery deposed over fifty witnesses and spent substantial time and energy preparing Smith's defense. Smith's defense was planned and organized with Montgomery as lead counsel, and consistent with Montgomery's strategies and theories.

On May 7, 2007, the State filed an "Additional Minute of Testimony" for Earsery. The additional minute of testimony stated:

> In addition to testifying to matters contained in Minutes of testimony previously filed in this case, [Earsery] will testify, identify and introduce into evidence recordings of two (2) phone conversations which originated with himself from the Black Hawk County Jail on 7/9/2006 between the hours of 9:00 and 9:30 PM. [Earsery] will testify and identify the voices on said phone conversations. [Earsery] will testify that said voices are those of Shylandra Dunn (aka: Lan Lan) and Shytari Dunn (aka: TD or TT). [Earsery] will testify as to conversations with Bud Dunn. . . . [Earsery] will testify, identify and introduce into evidence said two (2) phone calls. [Earsery] will testify as to the foundation for said phone calls.

Thus, the additional minute clarified Earsery's expected testimony, but did not change the substance of the original minutes of testimony. In

---

[5]Consistent with his belief that Earsery's testimony was only foundational, Lanigan elected not to depose Earsery.

fact, the additional minute did nothing to alter the foundational nature of Earsery's testimony.

As trial approached, the district court's deadline for filing pre-trial motions came and passed. On May 9, 2007, after the deadline for filing pre-trial motions had passed, the State filed a "Motion For *Watson* Hearing To Determine Conflict of Interest."[6] The State's motion asserted, for the first time, that Montgomery should be disqualified as Smith's counsel because of an actual conflict of interest arising from the Parrish Firm's concurrent representation of Smith and Earsery.

A hearing on the State's motion was held on May 18, 2007 approximately two weeks before Smith's trial was scheduled to begin. The State contended Earsery would be an important witness for the State, and asserted the actual conflict required the total disqualification of Montgomery from any further representation of Smith on the murder charge. Montgomery and Lanigan disputed the State's claims, contending (1) Earsery was merely a foundational witness, (2) no actual conflict existed precluding Montgomery's continuing representation of Smith, and (3) partial disqualification would be an adequate response to the perceived potential conflict of interest. Montgomery informed the district court of the protective measures taken to mitigate the potential conflict, including the decision to have Lanigan handle all matters related to Earsery. Smith acknowledged and voluntarily waived the possible conflict on the record during the hearing, and expressed to the district court his desire that Montgomery should continue to serve as defense counsel.

---

[6]In earlier discussions with Smith's attorneys, the prosecutors suggested a hearing would only be necessary to create a record of Smith's voluntary waiver of any "potential conflict." A district court order entered on April 23, 2007 had noted such a hearing could be held on short notice at either party's request. Neither party requested a hearing before the deadline for filing motions passed.

The district court found Earsery is a "key prosecution witness," and concluded an "actual conflict of interest" requiring Montgomery's total disqualification arose from the Parrish Firm's concurrent representation of Smith and Earsery. Smith filed a motion urging the district court to reconsider its ruling, and requesting an opportunity to make an offer of proof.[7] The district court denied the motion.[8]

Smith sought and we granted interlocutory discretionary review of the district court's order. We stayed all further proceedings in the district court pending this appeal.

**II.    Scope of Review.**

"A determination of whether a conflict exists is a mixed question of fact and law." *Pippins v. State*, 661 N.W.2d 544, 548 (Iowa 2003) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S. Ct. 1708, 1715, 64 L. Ed. 2d 333, 342 (1980)); *see also State v. Vanover*, 559 N.W.2d 618, 627 (Iowa 1997) (utilizing a modified version of the de novo standard to analyze a conflict of interest issue).

When a defendant claims a violation of his Sixth Amendment rights, our review is generally de novo. *Pippins*, 661 N.W.2d at 548 (citing *State v. Watson*, 620 N.W.2d 233, 235 (Iowa 2000); *Vanover*, 559 N.W.2d at 627). At the same time, "[w]hether the facts show an actual conflict of interest or a serious potential for conflict is a matter for trial court discretion." *Id.* (citing *Watson*, 620 N.W.2d at 235; *Vanover*, 559 N.W.2d at 627); *see also Wheat v. United States*, 486 U.S. 153, 164, 108

---

[7]The motion was captioned "Motion to Reconsider and Motion for Expanded and Amended Findings of Fact and Conclusions of Law and Motion for Further Hearing for Offer of Proof and Request for *In Camera* Inquiry and Combined Incorporated Memorandum of Law."

[8]On appeal, Smith assigns as error the district court's decision to deny an offer of proof. We do not reach that issue because we reverse and remand with instructions for other reasons.

S. Ct. 1692, 1700, 100 L. Ed. 2d 140, 152 (1988) (noting an evaluation of an actual conflict of interest is left primarily to the discretion of the trial court). This court will "find an abuse of that discretion only when a party claiming it shows 'the discretion was exercised on grounds or for reason clearly untenable or to an extent clearly unreasonable.' " *Pippins*, 661 N.W.2d at 548 (quoting *Vanover*, 559 N.W.2d at 627).

### III. Discussion.

**A. Constitutional Right to Counsel-of-Choice.** The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Iowa Constitution similarly states: "In all criminal prosecutions . . . the accused shall have a right to . . . have the assistance of counsel." Iowa Const. art. I, § 10.

"[A]n element of [the Sixth Amendment] right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S. Ct. 2557, 2561, 165 L. Ed. 2d 409, 416 (2006) (citing *Wheat*, 486 U.S. at 159, 108 S. Ct. at 1697, 100 L. Ed. 2d at 148). Stated another way, " 'the Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.' " *Id.* (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–25, 109 S. Ct. 2646, 2652, 105 L. Ed. 2d. 528, 541 (1989)).

However, the defendant's right to counsel of choice is " 'circumscribed in several important respects.' " *Id.* (quoting *Wheat*, 486 U.S. at 159, 108 S. Ct. at 1697, 100 L. Ed. 2d at 148). It cannot be

overlooked that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159, 108 S. Ct. at 1697, 100 L. Ed. 2d at 148.

As the Eighth Circuit has noted, "[i]n general, defendants are free to employ counsel of their own choice and the courts are afforded little leeway in interfering with that choice." *United States v. Cox*, 580 F.2d 317, 321 (8th Cir. 1978) (citation omitted). However, we have recognized:

> [t]here are times when an accused's right to counsel of choice must yield to a greater interest in maintaining high standards of professional responsibility in the courtroom. The trial court may therefore disqualify counsel *if necessary* to preserve the integrity, fairness, and professionalism of trial court proceedings.

*Vanover*, 559 N.W.2d at 626 (citation omitted) (emphasis added) (affirming the district court's disqualification of the defendant's attorney whom the State intended to call as a witness); *see also State v. Powell*, 684 N.W.2d 235, 242 (Iowa 2004) (holding the existence of a possible conflict required remand for a determination of whether an actual conflict of interest existed, and holding a new trial would be required if an actual conflict existed).

Indeed, when a defendant's counsel of choice proceeds in representation despite an actual and apparent conflict of interest:

> "[T]he court should not be required to tolerate [such] inadequate representation of a defendant. Such representation . . . invites disrespect for the integrity of the court [and] it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of waiver or the fairness of the proceedings in his [or her] own court and the subtle problems implicating the defendant's comprehension of the waiver."

*Vanover*, 559 N.W.2d at 627 (quoting *Wheat*, 486 U.S. at 162, 108 S. Ct. at 1698–99, 100 L. Ed. 2d at 151 (internal quotations omitted)). Although district courts need not tolerate inadequate representation to protect a defendant's right to choose his counsel, a defendant who is *erroneously* deprived of the right to counsel of his or her choice is entitled to relief. *Gonzalez-Lopez*, 548 U.S. at 150, 126 S. Ct. at 2564–65, 165 L. Ed. 2d at 419–20.

With these principles in mind, we will address whether the district court erred (1) in concluding the Parrish Firm's concurrent representation of Smith and Earsery constituted an actual conflict of interest requiring Montgomery's disqualification; and (2) in ordering Montgomery's total, rather than partial, disqualification.

**B.    The Nature of Montgomery's Conflict.**    We have considered in two recent cases the effect of a defense counsel's conflict of interest on a defendant's right to counsel of choice. *See State v. Smitherman*, 733 N.W.2d 341 (Iowa 2007); *Watson*, 620 N.W.2d 233. In both cases, the defendant's attorney was, at least for some length of time, directly engaged in the concurrent representation of both a defendant and a witness for the prosecution. *See Smitherman*, 733 N.W.2d at 343–45; *Watson*, 620 N.W.2d at 234–35. Apart from this initial similarity, however, the facts and legal conclusions of the two cases diverge.

In *Watson*, the defendant was charged with murdering his father. 620 N.W.2d at 234. Ross-Boon and Sissel, colleagues in the public defender's office, were appointed to represent Watson. *Id.* At trial, a witness for the State testified he overheard Watson admit he shot his father. *Id.* On cross-examination by Sissel, the witness admitted he was facing pending criminal charges, and disclosed that Ross-Boon was his counsel. *Id.* at 235. The trial court made no inquiry into the nature of

the conflict arising from Ross-Boon's concurrent representation of Watson and the witness when it was revealed, and neither party objected in the district court. *Id.* In the direct appeal from his conviction, Watson first claimed Ross-Boon labored under an actual conflict of interest. *Id.* Watson argued the court's failure to conduct an inquiry into the conflict required an automatic reversal of his conviction. *Id.*

After an analysis of Sixth Amendment authorities, we adopted the "presumed prejudice" rule. *Id.* at 235–36. This rule requires a defendant's conviction be reversed, regardless of guilt, if an actual conflict of interest existed. *Id.* at 236 (citations omitted). However, we also noted "if the trial court record shows merely a *possibility of a conflict,* prejudice will *not* be presumed." *Id.* (citing *Cuyler,* 446 U.S. at 348, 100 S. Ct. at 1718, 64 L. Ed. 2d at 346) (emphasis added). Accordingly, " 'a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' " *Id.* (quoting *Cuyler,* 446 U.S. at 348, 100 S. Ct. at 1718, 64 L. Ed. 2d at 346).

We concluded counsel's actual conflict of interest mandated the reversal of Watson's conviction where the trial court failed to make an inquiry into the conflict even after it became apparent. *Id.* at 237. We stated, "[i]t is only in cases of uncertainty, where the record shows the *mere possibility of a conflict,* that the additional requirement of an adverse effect on counsel's performance is required to establish an actual conflict." *Id.* at 238. We were not swayed by the fact Sissel handled all questioning of the adverse witness, because both Ross-Boon and Sissel were members of the same "firm" (the public defender's office), and they had full and equal access to the witness's confidences. *Id.* at 241.

12

In *Smitherman,* we addressed similar, but not identical, circumstances. 733 N.W.2d at 341.[9] Two public defenders, Anderson and Reel, were appointed to represent Smitherman on a murder charge. *Id.* A jailhouse informant, who was concurrently represented by Reel on unrelated charges, came forward with information relevant to Smitherman's guilt. *Id.* Reel withdrew from the representation of Smitherman soon after he discovered the dual representation, and the public defender's office also promptly ceased all representation of the informant. *Id.* at 344. After his withdrawal as Smitherman's counsel, Reel was entirely screened off from any matters related to Smitherman's defense. *Id.*

The State filed a pre-trial application for a "*Watson* hearing" to determine if a conflict of interest required disqualification of all attorneys associated with the public defender's office. *Id.* A hearing on the application led the district court to find Smitherman wished to maintain his lawyer-client relationship with Anderson notwithstanding the former dual representation by Reel. *Id.* at 345. Based on the prompt "screening" actions of Reel and Smitherman's voluntary waiver of any conflict, the district court concluded no potential or actual conflict of interest existed. *Id.*

Smitherman was convicted. He filed an appeal claiming his constitutional rights were violated by the public defender's continued representation. *Id.* at 346. The appeal presented "one question: whether the defendant has made a showing whereby we can presume prejudice." *Id.* (citing *Watson,* 620 N.W.2d at 238). In *Mickens v. Taylor,* 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002), the Supreme Court

---

[9]We note that our decision in *Smitherman* was not available to the district court when it ruled on the motion at issue in this appeal.

explained that "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that *adversely affects counsel's performance*." 535 U.S. at 172 n.5, 122 S. Ct. at 1244 n.5, 152 L. Ed. 2d at 305 n.5 (emphasis added). In applying *Mickens*, we concluded it was Smitherman's burden to show "adverse effects" resulting from the claimed conflict of interest in order to obtain a reversal. *Smitherman*, 733 N.W.2d at 347 (citing *Mickens*, 535 U.S. at 172–73, 122 S. Ct. at 1244–45, 152 L. Ed. 2d at 304–05). In our application of this standard in *Smitherman*, we noted it was the defendant's burden after his conviction to show his counsel was adversely affected by the conflict in order to prove a violation of his constitutional rights where the district court had conducted a meaningful inquiry as to the claimed conflict prior to the conviction, and because Smitherman had indicated his preference before trial that representation by the public defender should continue. *Id.*

We distinguished *Watson*, a case in which the district court failed to conduct a reasonable inquiry into the apparent conflict and its effect on the defendant's constitutional right to counsel, and therefore did not apply its "presumed prejudice" rule in *Smitherman*. *Id.* at 347–48. Unlike the circumstances presented in *Watson*, "all the parties were manifestly aware of the conflict and took several precautions to assure [Smitherman's] rights were not violated," and Smitherman requested his defense counsel be permitted to continue the representation notwithstanding the conflict. *Id.* at 348. Under the circumstances, we concluded automatic reversal of Smitherman's conviction was not appropriate. *Id.*; *see also Wheat*, 486 U.S. at 163, 108 S. Ct. at 1699, 100 L. Ed. 2d at 151 (noting a district court must be afforded "substantial latitude" in refusing a defendant's waiver where a "potential

for conflict" may arise during trial). We determined Smitherman failed to show how his counsel's performance was "adversely affected" by the claimed conflict of interest, and concluded his right to conflict-free counsel was not violated. *Smitherman*, 733 N.W.2d at 349.

Because Smith has not yet been tried, our consideration of his claim is prospective rather than retrospective as it was in *Watson* and *Smitherman.* We conclude, however, that these recent cases reveal principles useful to our prospective analysis and the appropriate disposition of this appeal. We conclude Smith's Sixth Amendment right to counsel of his choice was violated by the district court's total disqualification of Montgomery under the circumstances presented here.

1. *The nature of the conflict.* We agree the *possibility* of a conflict is present under the facts and circumstances of this case. However, as in *Smitherman,* several facts weigh against finding an *actual* conflict of interest. Among them are: (1) the presence of non-conflicted co-counsel Lanigan who will be able to handle any aspect of Smith's defense that requires involvement with Earsery; (2) Smith's voluntary waiver on the record; (3) Montgomery's careful avoidance of involvement in Earsery's defense through the Parrish Firm so as to avoid disclosure to him of Earsery's client confidences; and (4) the purely speculative nature of the State's claim that Montgomery's representation of Smith will be adversely affected by the conflict. Taken together, these facts substantially mitigate the risk that Montgomery's continued representation of Smith will be burdened by an actual conflict.

a. *Presence of non-conflicted co-counsel.* The district court's decision failed to consider critical factual differences between the facts of this case and those presented in *Watson.* First, in *Watson,* conflicted-counsel Ross-Boon directly engaged in the concurrent representation of

the defendant and of a witness for the State. 620 N.W.2d at 238–39. Second, both of Watson's defense attorneys were members of the same firm (the public defender's office). *Id.* at 241. Thus co-counsel Sissel faced the same *actual conflict* as his colleague, Ross-Boon. *Id.* In the absence of evidence to the contrary, the court could only presume Sissel had full access to the same client confidences of both the witness and Watson as Ross-Boon, thus rendering the two attorneys equally conflicted. *See id.*

In sharp contrast, Montgomery has carefully avoided direct engagement in the Parrish Firm's representation of Earsery. Perhaps more importantly, Lanigan, Montgomery's *non-conflicted co-counsel* from an outside firm, is available to handle any defensive matters that relate to Earsery. Lanigan, as we have explained, is unaffiliated with the Parrish Firm and has not been exposed to the client confidences of Earsery. Lanigan is therefore free to question Earsery zealously (if it should become necessary) without the fear of divulging confidences. Lanigan's presence as co-counsel significantly distinguishes the facts of this case from those in *Watson,* and mitigates the risk Smith will receive inadequate representation. The district court abused its discretion in failing to distinguish this fact which led to its finding of an actual conflict and in turn to Montgomery's total disqualification.

b. *Voluntary waiver on the record.* Smith voiced an informed, unequivocal, voluntary waiver of the potential conflict on the record. Such a waiver of a conflict does not vitiate the court's duty to ensure a defendant receives zealous representation when the facts suggest an "actual conflict of interest or a serious potential for conflict of interest." *Vanover,* 559 N.W.2d at 626–27 (citation omitted); *see also Wheat,* 486 U.S. at 162, 108 S. Ct. at 1698–99, 100 L. Ed. 2d at 150–52 (noting

"where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver . . .").  However, a defendant's informed, voluntary, and express waiver of counsel's conflict is a significant factor in our determination of whether the defendant's right to counsel has been violated.

Smith's waiver was made with full awareness of the Parrish Firm's concurrent representation of Earsery, and with knowledge that Lanigan, who was not burdened with a conflict as to Earsery, would represent him in any examination of Earsery.  We find no reason on this record to believe Smith's waiver was uninformed, incomplete, or ineffective.  Like the defendant in *Smitherman*, Smith acknowledged Montgomery's potential conflict on the record, waived it, and indicated his desire for Montgomery to continue as his counsel.  *See Smitherman*, 733 N.W.2d at 344–45, 348 n.7 (discussing the defendant's waiver of a conflict and acquiescence to representation, but rendering no final conclusion as to the validity of the waiver).  While the district court does have latitude in refusing such waivers where "a serious potential for conflict exists," any possibility for an actual conflict in this case is mitigated by Montgomery's avoidance of all involvement in Earsery's defense and Lanigan's ability to handle any aspect of Smith's defense that requires contact with Earsery.  *See Vanover*, 559 N.W.2d at 626–27 (noting the district court has latitude in refusing waivers of conflict).  There is, in our view, no serious potential for an actual conflict that would preclude Montgomery's representation of Smith in this case.

c.  *Montgomery's efforts to avoid involvement with Earsery.*  To ensure Earsery's client confidences would not interfere with Montgomery's representation of Smith, counsel promptly took steps to mitigate any possible conflict arising from Earsery's involvement as a

witness. As we have noted, he avoided all contact with Earsery's defense within the Parrish Firm. Montgomery has had no contact with Parrish as to the cases of either Smith or Earsery, and has had no access to any of Earsery's client confidences.

Montgomery has also arranged to have no involvement in the examination of Earsery if he should be deposed or testify in Smith's trial. Like defense counsel in *Smitherman,* Montgomery has shielded himself from involvement in aspects of the defense which might involve an examination of Earsery so as to prevent any "potential conflict of interest" from having any "adverse affects" on Smith's defense. *See* 733 N.W.2d at 344, 348 (discussing the use of a "Chinese wall" by the public defender's office to prevent the exchange of client confidences and to ensure the defendant's rights were protected). The district court abused its discretion in determining an actual conflict existed despite the protective effects of Montgomery's careful efforts to avoid all involvement in Earsery's defense and in any aspect of Smith's defense that might require an examination of Earsery.[10]

---

[10]In applying an earlier version of the Iowa Rules of Professional Conduct, we recognized screens could be effective in mitigating imputed conflicts under certain circumstances. *See Smitherman*, 733 N.W.2d at 344, 348 (discussing the effective use of a "Chinese wall" by the public defender's office); *Doe v. Perry Cmty. Sch. Dist.*, 650 N.W.2d 594, 597–98 (Iowa 2002) (holding disqualification was appropriate, but referencing several ABA formal opinions where screening prevented the disqualification of an entire firm). It should be noted, however, that under the current version of the rules, screening will not prevent the imputation of conflicts of interest to other firm members in the practice of law. *See generally* Iowa Rs. Prof'l Conduct 32:1.7, 32:1.10; *see also* Randall B. Bateman, *Return to the Ethics Rules as a Standard for Attorney Disqualification: Attempting Consistency in Motions for Disqualification by the Use of Chinese Walls*, 33 Duq. L. Rev. 249, 259–61 (1995) (discussing the ABA's decision not to include screening as a defense for private practice attorneys under the Model Rules of Professional Conduct). Our holding in this case should therefore not be understood as a determination that screening will generally vitiate conflicts of interest. As Smith's constitutional right to choose his counsel was impacted by the order disqualifying Montgomery, we nonetheless consider the screening procedures implemented by Montgomery and the Parrish Firm as a factor in determining whether the alleged conflict is actual or merely potential, and our analysis of whether the claimed conflict is

d. *Speculative nature of the conflict.* The inherently speculative nature of the conflict in this case causes us to reject the district court's conclusion that an actual conflict requiring Montgomery's disqualification exists in this case. In *Watson*, the finding of an actual conflict was based, in part, on the fact that the testimony of the concurrently represented witness was directly adverse to the interests of the defendant. 620 N.W.2d at 239–41. Earsery's testimony appears to be merely foundational in nature and will be used primarily to introduce a tape-recorded telephone conversation.[11] Although the State speculates that Earsery's testimony might evolve into something more, the minutes of testimony offer no support for the proposition that the witness has personal knowledge of other matters which might allow him to testify in a manner directly adverse to Smith. Earsery's expected role in this case thus differs markedly from the role of the witness in *Watson* who testified he personally overheard the defendant admit commission of the charged crime. *See id.* at 234.

Assuming there were support for the conclusion that Earsery was a witness who might become directly adverse to Smith, we have already noted Lanigan, a non-conflicted attorney from an outside firm, is available to conduct all questioning of Earsery. In *Watson*, there was no outside, non-conflicted counsel available to conduct questioning of the

_____

serious or speculative. Given Smith's voluntary waiver, the presence of non-conflicted co-counsel, and the speculative nature of the claimed conflict in this case, we conclude the screens implemented by Montgomery are a mitigating factor under the circumstances presented here. We do not suggest that those screens, standing alone, would have been sufficient to preclude his disqualification.

[11]Attorneys Montgomery and Lanigan made professional statements indicating they foresaw no circumstance in which they would need to depose, cross-examine, or impeach Earsery. The minutes of testimony support counsel's conclusion that Earsery's testimony serves only a foundation purpose. The record is markedly devoid of support for the State's suggestion that Earsery could competently serve any other role as a witness.

adverse witness. *See id.* at 241. Lanigan, unlike both attorneys in *Watson,* is not in a situation of "divided loyalties."[12] He is readily available to handle any aspect of the case involving Earsery. *See generally Pippins,* 661 N.W.2d at 549 (noting one test for determining whether a conflict exists is "whether an attorney is placed in a situation conducive to divided loyalties"). The State presents no evidence or meritorious argument to suggest Lanigan is incapable of handling any examination of Earsery which might become necessary.[13]

2. *Rules of Professional Conduct.* The Iowa Rules of Professional Conduct provide provisions relevant to our analysis in cases, such as this, involving concurrent conflicts of interest. *See* Iowa Rs. Prof'l Conduct 32:1.7, 32:1.8, 32:1.10 (2005). The rules provide guidance in fully understanding and analyzing the conflict faced by Montgomery under the circumstances of this case.

> In relevant part, rule 32:1.7 states:
>
> (a) . . . [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be *directly adverse to* another client; *or*
>
> (2) there is a significant risk that the representation of one or more clients will be *materially limited by* the lawyer's responsibilities to another client . . . .

Iowa R. Prof'l Conduct 32:1.7 (emphasis added).

---

[12]From the time the potential conflict was discovered, Smith's attorneys have planned for Lanigan to handle any aspect of the defense that might involve Earsery. Indeed, it was Lanigan who elected not to depose Earsery as to his foundational role in this case.

[13]In both its written brief and at oral argument, the State provided a laundry list of "what if" scenarios where something unexpected might happen and Attorney Lanigan might be incapable of responding without the assistance of Montgomery. We find the list of "what ifs" unpersuasive especially in light of a complete lack of any evidence to suggest Lanigan would be incapable of handling, without Montgomery's involvement, any and all issues that may arise involving Earsery.

The conflict of interest rule outlined in rule 32:1.7 is subject to the imputation principles promulgated in rule 32:1.10. Rule 32:1.10 states:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by rule 32:1.7 . . . .

. . . .

(c) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in rule 32:1.7.

Iowa R. Prof'l Conduct 32:1.10; *see also* Iowa R. Prof'l Conduct 32:1.10, cmt. 2 (stating "a firm of lawyers is essentially one lawyer for the purposes of the rules governing loyalty to the client").

In applying these rules in our analysis of the possible conflict faced by Montgomery, we first look to rule 32:1.7 to determine if an actual conflict of interest exists in Montgomery's representation of Smith concurrently with Parrish's representation of Earsery. To qualify as an actual conflict of interest under the rule, Parrish's representation of Earsery must be *directly adverse to* Montgomery's representation of Smith, or the representation of either client must be *materially limited by* representation of the other. *See* Iowa R. Prof'l Conduct 32:1.7. If either standard is met, an actual conflict exists.

We conclude the concurrent representation of Smith and Earsery by the Parrish Firm, under the circumstances fully discussed above, meets neither the "directly adverse to" nor the "materially limited by" standards. Thus, the district court abused its discretion in concluding the conflict of interest in this case was an actual conflict.

**C.** **Partial Disqualification.** Having established neither the circumstances of this case nor an application of the Rules of Professional Conduct support the district court's finding an actual conflict under the

circumstances presented here, we conclude the total disqualification of Montgomery violated Smith's right to counsel.

"[T]he chosen method for dealing with a potential conflict, in the absence of a waiver, is the one which will alleviate the effects of the conflict while interfering the least with the defendant's choice of counsel." *United States v. Agosto*, 675 F.2d 965, 970 (8th Cir. 1982), *abrogated on other grounds, Flanagan v. United States*, 465 U.S. 259, 104 S. Ct. 1051, 79 L. Ed. 2d 288 (1984); *see also State v. Duncan*, 435 N.W.2d 384, 387 (Iowa 1988) (stating in cases of dual representation rather than joint representation "the danger of conflict is not as great, hence judicial scrutiny need not be as deep"). While recognizing the general principle that "[a] trial court has flexibility in making the difficult assessment of the potential for conflict," the Eighth Circuit noted "substantial weight is given to defense counsel's representations" in determining whether an actual conflict exists. *United States v. Flynn*, 87 F.3d 996, 1001 (8th Cir. 1996) (citation omitted) (affirming a defendant's conviction despite the fact his attorney had previously represented one of the government's adverse witnesses). *But see Powell*, 684 N.W.2d at 241 (noting that an attorney is in a precarious position when continuing representation under circumstances suggesting the existence of divided loyalties).

We believe the appropriate remedy in this case is a partial disqualification of Montgomery from any aspect of Smith's defense involving Earsery. Partial disqualification will "alleviate the effects of the conflict while interfering the least with [Smith's] choice of counsel." *See Agosto*, 675 F.2d at 970. Montgomery's conflict is limited to one foundational witness. Lanigan is ready, willing, and able to handle all aspects of the case related to that witness. Under these circumstances, partial disqualification will limit the danger that the potential conflict will

prejudice Smith's right to zealous representation while protecting his valuable right to choose the counsel who will represent him.

In similar situations, other courts have allowed a defendant's counsel of choice to continue representation when another, non-conflicted counsel was available to handle aspects of the case involving the witness giving rise to the conflict. *See Rodriquez v. Chandler*, 382 F.3d 670, 673 (7th Cir. 2004) (concluding the disqualification of an attorney was unnecessary where "having co-counsel cross-examine [the witness] would have eliminated all risks"); *Agosto*, 675 F.2d at 974 (discussing counsel's continued representation of a defendant so long as co-counsel was employed to handle cross-examination of certain witnesses, and so long as defendant executed a waiver); *United States v. Johnson*, 131 F. Supp. 2d 1088, 1103 (N.D. Iowa 2001) (noting the presence of non-conflicted co-counsel to handle matters involving a specific witness, if assigned to do so, supported the conclusion disqualification of counsel was unnecessary).

The district court ordered total disqualification of Montgomery three weeks before trial, despite the fact that Montgomery had spent nearly a year preparing for Smith's defense, and, more importantly, despite the presence of non-conflicted co-counsel to handle the cross-examination of Earsery *if* such examination becomes necessary. The district court gave little or no weight to defense counsel's representations regarding Earsery's limited role as a foundational witness and the speculative nature of the possible conflict. Given the proactive, protective measures taken by Montgomery and Lanigan, as well as both attorneys' professional statements that no cross-examination or impeachment of Earsery is anticipated, we conclude the total

disqualification of Montgomery unreasonably interferes with Smith's right to counsel.

## IV.    Conclusion.

We conclude the district court abused its discretion in ordering the total disqualification of Montgomery from representing Smith in his murder defense.  The total disqualification of Montgomery under the circumstances of this case violated Smith's constitutional right to choose who will represent him in this case.  Partial disqualification will mitigate any possible conflict while minimizing interference with the defendant's rights.  Therefore, we reverse and remand with instructions to the district court for entry of an order disqualifying Montgomery only from those aspects of Smith's defense involving Earsery.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**