# IN THE SUPREME COURT OF IOWA

No. 13–1226

Filed March 13, 2015

**STATE OF IOWA,**

Appellee,

vs.

**LAVELLE LONELLE McKINLEY,**

Appellant.

---

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

A criminal defendant appeals the district court's order disqualifying the entire Des Moines adult public defender's office from representing him. **REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, John P. Sarcone, County Attorney, and Nan M. Horvat, Assistant County Attorney, for appellee.

Erin M. Carr of Carr & Wright, P.L.C., Des Moines, for amicus curiae Heather Hickman.

**HECHT, Justice.**

The district court appointed two attorneys from the Des Moines adult public defender's office to represent the defendant on a murder charge. After reviewing the State's list of expected witnesses, the two defense attorneys realized other attorney colleagues in their office had previously represented three of the State's witnesses on unrelated matters. The attorneys brought this potential conflict of interest to the district court's attention and requested a ruling whether a conflict of interest precludes them from representing the defendant. After the hearing, the district court concluded a conflict existed and disqualified all attorneys employed at the Des Moines adult public defender's office. Upon review, we conclude the potential conflict of interest shown under the circumstances presented in this record did not justify disqualification of the attorneys. Accordingly, we reverse and remand for further proceedings.

**I. Background Facts and Proceedings.**

The State of Iowa charged Lavelle McKinley with first-degree murder following the death of Cynthia Rouse. The district court appointed two attorneys from the Des Moines adult public defender's office, Jennifer Larson and Heather Lauber, to represent McKinley. Long before trial was to begin, Larson and Lauber discovered other attorneys in their office had previously represented three potential witnesses for the State: Cheyenne Rouse, the decedent's husband who discovered the body; Heather Hickman, the decedent's neighbor whom the State expects to testify she heard footsteps near the decedent's apartment shortly before the alleged homicide; and Wayne Manuel, the decedent's brother-in-law. Neither Larson nor Lauber had ever personally represented these witnesses, but other public defenders from the same office (Jill

Eimermann and Jennifer Russell) had done so. The prior representations were all unrelated to the murder charge against McKinley and had all concluded months or years before McKinley was arrested for the crime charged in this case.

Larson and Lauber requested a hearing and a determination whether a conflict of interest existed requiring their disqualification. The court scheduled a hearing and appointed independent counsel to represent each of the three potential witnesses. At the hearing, Larson and Lauber asserted their public defender colleagues' past representations of Rouse, Hickman, and Manuel on unrelated matters presents no conflict because those matters concluded well before McKinley was charged and therefore are not concurrent with the representation of McKinley. They contended the temporal separation between the current representation of McKinley and the previous concluded representations of the witnesses provides assurance against the risk of divided loyalties in continuing to represent McKinley.

Larson and Lauber assured the court they had no information about the matters for which their colleagues had previously represented Rouse, Hickman, and Manuel; they had not reviewed the existing files kept in the public defender's office pertaining to those matters; and they had already instituted measures preventing them from accessing such information and files during the pendency of this case. Therefore, they contended any potential conflict of interest arising from the prior representations of the three witnesses by other attorneys in the Des Moines office should not be imputed to them. Additionally, the hearing record included a colloquy with the court in which McKinley expressly acquiesced in any potential conflict of interest and indicated his desire to have Larson and Lauber continue representing him. After

the hearing, McKinley filed a document confirming his acquiescence in any potential conflict and reaffirming his wish for continued representation by Larson and Lauber.[1]

Rouse and Hickman informed the court through their counsel who were present at the hearing that they would neither waive any attorney–client privilege with the public defender's office nor consent to Larson and Lauber representing McKinley. Manuel's appointed attorney also attended the hearing and disclosed he had been unable to contact or consult with Manuel.[2] The State urged the court to disqualify the entire Des Moines adult public defender's office. The State based its position in part on the concern that any conviction resulting from a trial in which McKinley is represented by Larson and Lauber might be subject to reversal if an appellate court concludes on appeal that a conflict of interest adversely affected their representation of McKinley.

After the hearing, the court issued a ruling concluding a conflict of interest disqualifies all attorneys employed at the Des Moines adult public defender's office from serving as McKinley's counsel in this case. The court's ruling was based on the proposition that Larson and Lauber's continuing representation of McKinley would breach duties owed to the public defenders' former clients while infringing upon McKinley's Sixth Amendment right to conflict-free counsel. The court reasoned that disqualification of all attorneys from the same public defender's office is required because an actual, nonspeculative conflict

---

[1]Because we conclude in this case that no actual conflict or serious potential conflict justified disqualification of Larson and Lauber, we do not decide whether the in-court colloquy and the written document McKinley filed after the hearing effected a valid waiver of the right to conflict-free counsel. *See State v. Smitherman*, 733 N.W.2d 341, 348 n.7 (Iowa 2007).

[2]There was an outstanding warrant for Manuel's arrest on an unrelated matter.

existed between the interests of McKinley and those of the three witnesses.

The conflict, the court explained, was based on the perception that Larson and Lauber's representation of McKinley was directly and materially adverse to Rouse, who had been represented in the past by other public defenders from the same office in connection with felony drug offenses.[3] The court designated the juvenile public defender as McKinley's new counsel.

McKinley applied for discretionary interlocutory review, and the State indicated it did not resist. We granted discretionary review and retained the appeal.

## II. Scope of Review.

The question of whether a conflict exists is a mixed question of fact and law. *Pippins v. State,* 661 N.W.2d 544, 548 (Iowa 2003). When a defendant claims a violation of the constitutional right to counsel, our review is generally de novo. *State v. Smith,* 761 N.W.2d 63, 68 (Iowa 2009); *State v. Smitherman,* 733 N.W.2d 341, 345 (Iowa 2007).

"Whether the facts show an actual conflict of interest or a serious potential for conflict is a matter for trial court discretion . . . ." *Pippins,* 661 N.W.2d at 548. We review these conflict-of-interest determinations for an abuse of discretion. *Smith,* 761 N.W.2d at 68. "We find an abuse of discretion only when the . . . discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State*

---

[3]Although the district court focused primarily on the conflict between the interests of McKinley and Rouse, the court concluded Hickman and Manuel's interests were similarly adverse to McKinley's and further justified the disqualification remedy it chose.

*v. Vanover*, 559 N.W.2d 618, 627 (Iowa 1997); *accord Smith*, 761 N.W.2d at 68–69; *Pippins*, 661 N.W.2d at 548.

### III. The Parties' Positions.

The parties are not directly adverse on the disqualification issue. McKinley urges reversal of the disqualification order, reinstatement of Larson and Lauber as defense counsel, and remand for trial. The State, couching its position in furtherance of promoting error-free trials and protecting the finality of convictions, agrees the district court may have erred—but not because the district court found Larson and Lauber were burdened by a conflict of interest. Rather, the State expresses concern that if McKinley is convicted, the verdict might be overturned on appeal because the district court accepted the county attorney's suggestion to override McKinley's choice of counsel. *See* Gary T. Lowenthal, *Successive Representation by Criminal Lawyers*, 93 Yale L.J. 1, 52 (1983) [hereinafter Lowenthal] ("Even when the court appoints counsel for an indigent defendant, it cannot discharge the lawyer over the defendant's objection absent compelling justification."). Thus, the State asks for guidance about the balance between conflict-of-interest rules and a defendant's Sixth Amendment rights and requests a remand for a new hearing on the conflicts issue.[4]

### IV. Analysis.

We conclude the circumstances of this case do not rise to the level of an actual conflict. We further conclude the present record evidences no serious potential conflict likely to divide Larson and Lauber's loyalties or otherwise compromise their duty to provide zealous representation for

---

[4]Hickman, as amicus curiae, contends disqualification of Larson and Lauber was appropriate under the circumstances presented here and asserts her refusal to consent to the conflict makes the attorneys' representation of McKinley impermissible.

McKinley. Thus, the potential conflict presented in this factual scenario does not override McKinley's interest in continuing his attorney–client relationship with Larson and Lauber.

**A. McKinley's Interest in Continuity of Appointed Counsel.**

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel also includes a right to choose that counsel. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S. Ct. 2557, 2561, 165 L. Ed. 2d 409, 416–17 (2006). However, McKinley did not hire Larson and Lauber; the district court appointed them to represent him. The Supreme Court has observed that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.* at 151, 126 S. Ct. at 2565, 165 L. Ed. 2d at 421; *see also United States v. Espino*, 317 F.3d 788, 798–99 (8th Cir. 2003) ("[A]n indigent defendant has no right to demand of a court that a particular attorney, or particular attorneys, be appointed to represent him.").

Yet, a right to choose one's appointed counsel is different from "a right to choose *to continue* an ongoing attorney-client relationship." Janet C. Hoeffel, *Toward a More Robust Right to Counsel of Choice*, 44 San Diego L. Rev. 525, 549 (2007) (emphasis added). Several commentators have suggested that although indigent defendants cannot choose their initial appointed attorney, they should at least have the right to continuity of representation after an attorney has been appointed. *See, e.g., id.*; Lowenthal, 93 Yale L.J. at 52; Anne Bowen Poulin, *Strengthening the Criminal Defendant's Right to Counsel*, 28 Cardozo L. Rev. 1213, 1249 (2006) [hereinafter Poulin] ("[C]ourts should recognize that indigent defendants have a constitutionally protected right to have the initially appointed attorney continue to represent them and

that this right can be overcome only under limited circumstances."). One scholar has observed that "[a] defendant's relationship with counsel may be critical to the quality and effectiveness of the representation the defendant receives." Poulin, 28 Cardozo L. Rev. at 1258.

Courts are split on the importance of continuity of the relationship between indigent defendants and their appointed attorneys. Some have concluded there is no right to continuity of appointed counsel. *See United States v. Basham*, 561 F.3d 302, 324–25 (4th Cir. 2009); *Daniels v. Lafler*, 501 F.3d 735, 738–39 (6th Cir. 2007); *United States v. Parker*, 469 F.3d 57, 61 (2d Cir. 2006); *State v. Reeves*, 11 So. 3d 1031, 1065–66 (La. 2009). On the other hand, several courts have concluded once an attorney is appointed, the court should be just as hesitant to remove them as it would be to remove a privately-retained attorney. *See, e.g., United States v. Myers*, 294 F.3d 203, 206 (1st Cir. 2002) ("Once a court appoints an attorney to represent an accused . . . there must be good cause for rescinding the original appointment and interposing a new one."); *Lane v. State*, 80 So. 3d 280, 295 (Ala. Crim. App. 2010) ("With respect to continued representation, . . . there is no distinction between indigent defendants and nonindigent defendants."); *People v. Harlan*, 54 P.3d 871, 878 (Colo. 2002) ("A defendant's desire for continued representation by a court-appointed public defender is 'entitled to great weight.' . . . [A]n indigent defendant has a presumptive right to continued representation by court-appointed counsel absent a factual and legal basis to terminate that appointment." (quoting *Rodriguez v. Dist. Ct.*, 719 P.2d 699, 707 (Colo. 1986))); *People v. Burton,* 811 N.Y.S.2d 663, 664 (App. Div. 2006) (reversing a conviction and granting a new trial because the trial court "deprived [the] defendant of the right to continued

representation by assigned counsel with whom he had formed an attorney-client relationship").

We adopt the latter view and hold that once an attorney is appointed, they should not be removed "absent a factual and legal basis to terminate that appointment." *Harlan*, 54 P.3d at 878. Trust and good communication are crucial features of an attorney–client relationship. This is true when a client has resources and privately retains a lawyer; and it is no less true when a client is indigent and obtains counsel appointed by the court. In both instances, opportunities for establishing trust and effective communication are generally enhanced over time through interpersonal contact. Once established, the interest in maintaining a relationship of trust with counsel is of no less importance to an indigent client than to one with ample resources to hire counsel.

Yet, solicitude for a client's preference for retaining their court-appointed attorney does not preclude disqualification when circumstances require it. "The right to counsel of choice—either initially or continued representation—is not absolute . . . either for indigent or nonindigent defendants." *Lane*, 80 So. 3d at 295; *see also Vanover*, 559 N.W.2d at 626–27 (noting "a presumption in favor of the accused's counsel of choice" can be rebutted (internal quotation marks omitted)); *State v. Williams*, 285 N.W.2d 248, 255 (Iowa 1979) ("[T]he right to choice of counsel by both indigent and non-indigent defendants is limited . . . ."). The court can still disqualify the defendant's preferred attorney if the circumstances present an actual conflict or a serious potential for conflict. *Wheat v. United States*, 486 U.S. 153, 162–63, 108 S. Ct. 1692, 1699, 100 L. Ed. 2d 140, 150–51 (1988) (giving courts this power when one attorney represents codefendants); *accord Smith*, 761 N.W.2d at 73; *Vanover*, 559 N.W.2d at 626–27.

**B. Defining "Actual Conflict" and "Serious Potential for Conflict."** A conflict does not exist just because one party asserts it does. *Pippins*, 661 N.W.2d at 547 (concluding a defense attorney's characterization of his previous representation of a prosecution witness as a conflict "does not necessarily make it so"); *cf. Bottoms v. Stapleton*, 706 N.W.2d 411, 419 (Iowa 2005) (refusing, in a civil case, to disqualify an attorney "simply because the opposing party *alleges* the *possibility* of differing interests"). Instead, we must independently evaluate whether the circumstances show an actual conflict or serious potential for conflict.

The definition of "actual conflict" has been expressed in various ways. In *State v. Watson*, we stated an actual conflict occurs when " 'an attorney is placed in a situation conducive to divided loyalties.' " 620 N.W.2d 233, 239 (Iowa 2000) (quoting *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991)); *see also Pippins*, 661 N.W.2d at 548 (repeating the "divided loyalties" standard). We concluded concurrent representation of a defendant and a witness against him in a criminal case created divided loyalties and burdened the defense's pretrial investigation and trial strategy. *Watson*, 620 N.W.2d at 240–41; *see also United States v. Lech*, 895 F. Supp. 586, 590 (S.D.N.Y. 1995) (defining actual conflict as something that "impedes the attorney's ability to present a vigorous defense").

Later, the Supreme Court defined actual conflict under the Sixth Amendment as "a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5, 122 S. Ct. 1237, 1244 n.5, 152 L. Ed. 2d 291, 305 n.5 (2002); *see Smitherman*, 733 N.W.2d at 347 (adopting the *Mickens* definition in Iowa). We applied the "adverse effect" formulation in *Smitherman* where the trial court had

conducted an inquiry into the conflict in advance of trial. *Smitherman*, 733 N.W.2d at 347 (concluding the claimed conflict did not require reversal of Smitherman's conviction because he failed to establish the conflict had an adverse effect on trial counsel's representation).[5]

In this case, the district court properly held a hearing on the conflict issue early in the pretrial stage of the proceedings. The court's analysis of the nature and gravity of the alleged conflict was therefore primarily forward-looking rather than a retrospective assessment of whether the public defenders' prior representation of the witnesses had any adverse effect on Larson and Lauber's representation of McKinley. The forward-looking assessment at the pretrial stage of this case required an assessment of the likelihood that a potential conflict might blossom into an actual conflict during either the pretrial stage or the trial stages of McKinley's case. *See Smith*, 761 N.W.2d at 72; *see also* Lowenthal, 93 Yale L.J. at 58 ("In most cases the court can only assess the risk that a conflict will occur . . . .").

This type of prospective analysis applies the "serious potential for conflict" standard. A serious potential for conflict occurs when the record indicates an actual conflict is likely to arise. *See United States v. Johnson*, 131 F. Supp. 2d 1088, 1099 (N.D. Iowa 2001). We turn to a discussion of the nature of the potential conflict at issue in this case and our reasons for concluding that the risk it will adversely affect Larson and Lauber's representation of McKinley is insufficient to countermand McKinley's interest in maintaining his attorney–client relationship.

---

[5]We left open in *Smitherman* the question whether prejudice might still be presumed under article I, section 10 of the Iowa Constitution—even without a showing of adverse effect arising from a conflict—if a trial court fails to conduct any inquiry whatsoever. *Smitherman*, 733 N.W.2d at 347.

**C. Ethical Rules and Standards.** The district court relied primarily on Iowa Rules of Professional Conduct 32:1.7 and 32:1.9 in concluding an actual conflict exists between the interests of McKinley and those of the three witnesses the State intends to call. These rules of professional conduct provide guidelines aiding us in determining whether an actual conflict is likely to arise if Larson and Lauber continue representing McKinley. The guidelines supplied by the rules are relevant, but are not alone dispositive. *Smith*, 761 N.W.2d at 75; *see Smitherman*, 733 N.W.2d at 348–49 (discussing ethical rules mostly in dicta).

1. *Rule 32:1.7.* Rule 32:1.7 prohibits an attorney from representing two clients when a concurrent conflict of interest exists. Iowa R. Prof'l Conduct 32:1.7(a). A concurrent conflict of interest arises in one of two ways: either one representation is "directly adverse to another client," or "there is a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person." *Id.* r. 32:1.7(a)(1)–(2).

Because the terms are listed separately, "another client" and "former client" cannot mean the same thing. We presume statutes or rules do not contain superfluous words. *See Sallee v. Stewart*, 827 N.W.2d 128, 153 (Iowa 2013); *State v. Soboroff*, 798 N.W.2d 1, 7 (Iowa 2011). Thus, "another client" means another *current* client. Rouse, Hickman, and Manuel were no longer current clients of the public defender's office when Larson and Lauber began defending McKinley. Accordingly, no concurrent conflict of interest exists under rule 32:1.7(a)(1).

Thus, if there is any concurrent conflict of interest here, it occurs because Larson and Lauber "will be materially limited" by their

responsibilities to the public defender's former clients Rouse, Hickman, and Manuel. *See* Iowa R. Prof'l Conduct 32:1.7(a)(2). The comments to the rules suggest a material limitation occurs when a "lawyer's ability to consider, recommend, or carry out an appropriate course of action" is hampered. *Id.* r. 32:1.7 cmt. [8]. Put another way, the conflict formulation under rule 32:1.7(a)(2) is consistent with the definition we applied in *Watson*: a conflict arises when a danger of divided loyalties burdens or impedes the attorneys' defense strategy. *Watson*, 620 N.W.2d at 240–41; *see also Lech*, 895 F. Supp. at 590.

In *Smith*, we stated concurrent representation of a defendant and a witness on unrelated matters by separate attorneys from the same private law firm did not meet the material limitation standard when counsel for the defendant did not personally represent the witness, had no knowledge of the witness's confidential information, and had taken measures to screen himself from the law firm's personnel and files with such information. *Smith*, 761 N.W.2d at 75. In this case, we conclude other public defenders' *past* representation of the witnesses on matters unrelated to the crime charged against McKinley also presents no risk of materially limiting Larson and Lauber's representation of McKinley. Indeed, on this record we find no significant likelihood that Larson and Lauber will be foreclosed from formulating or implementing any particular defense strategy as a consequence of their colleagues' former representation of the witnesses. Accordingly, we conclude on this record Larson and Lauber are not materially limited by a concurrent conflict prohibiting their representation of McKinley under rule 32:1.7.

2. *Rule 32:1.9.* Rule 32:1.9 addresses duties owed by attorneys to former clients. The rule states that a lawyer cannot represent a subsequent client "in the same or a substantially related matter in which

that person's interests are materially adverse to the interests of the former client." Iowa R. Prof'l Conduct 32:1.9(a). The district court concluded Larson and Lauber's colleagues' former representation of the three witnesses is substantially related to the defense of McKinley because Larson and Lauber will likely use the witnesses' prior convictions for impeachment purposes. Accordingly, it ruled Larson and Lauber could not continue representing McKinley without informed consent from the witnesses. On review, we conclude the district court's interpretation of the phrase "substantially related" was clearly untenable.

The murder charge against McKinley is unquestionably not the same matter in which the public defender's office previously represented Rouse, Hickman, and Manuel. Therefore, a conflict exists under rule 32:1.9 only if the previously-concluded matters in which the public defenders represented the witnesses are substantially related to the pending case against McKinley. The comments to rule 32:1.9 reveal matters are substantially related if "confidential factual information . . . obtained in the prior representation would materially advance the client's position in the subsequent matter." Iowa R. Prof'l Conduct 32:1.9 cmt. [3]. There is no evidence in this record tending to establish any confidence or secret learned during the public defenders' prior representations of the witnesses on unrelated matters would be used against Rouse, Hickman, or Manuel, or that any confidence or secret would materially benefit McKinley's defense. *See Johnson*, 131 F. Supp. 2d at 1088 ("[T]here is simply no conflict of interest that must be remedied in [the attorney]'s successive representation of [the witness] and Johnson, because there is no risk that attorney-client privileged information could be implicated in the course of [the attorney]'s cross-examination of [the witness] on Johnson's behalf."). We conclude the

risk of revealing any confidences or secrets revealed to Eimermann or Russell is insubstantial here because Larson and Lauber have represented through professional statements that they have no knowledge of such information and have taken prophylactic measures shielding themselves from it. *See United States v. Flynn*, 87 F.3d 996, 1001 (8th Cir. 1996) ("In determining whether a conflict of interest exists, substantial weight is given to defense counsel's representations."); *Duvall v. State*, 923 A.2d 81, 95 (Md. 2007) ("[D]efense counsel's representations about specific conflicts of interests should be credited . . . . Lawyers are officers of the court and should be treated as such." (Citation omitted.)).

The record reveals the witnesses have prior criminal convictions. Notably, however, these histories are not confidential facts. As one commentator explains:

> Loyalty to a client, and the appearance of propriety, are values that must be protected. However, no rule of ethics prevents an attorney from confronting a former client in an unrelated case about "generally known" facts, such as a felony conviction or other matters . . . of public record.

Jeff Brown, *Disqualification of the Public Defender: Toward a New Protocol for Resolving Conflicts of Interest*, 31 U.S.F. L. Rev. 1, 18 (1996) [hereinafter Brown] (footnotes omitted). Therefore, Larson and Lauber's use of the witnesses' prior convictions for impeachment purposes could materially benefit McKinley's defense, but it would not reveal a client confidence or secret. Iowa R. Prof'l Conduct 32:1.9 cmt. [3] ("Information that has been disclosed to the public . . . will not be disqualifying.").

If the matters for which prior representation was provided are not the same as, or substantially related to, the matters for which the current representation is provided, the current representation can continue without the former client's consent. *See* Iowa R. Prof'l Conduct

32:1.9(a); *see also* Lowenthal, 93 Yale L.J. at 56 (concluding a witness's opposition to defense counsel's representation of the defendant is important *if* "the court finds a substantial relationship between the earlier representation and the defendant's case"). We find no evidence in this record tending to establish a substantial relationship between the crime charged in this case and the matters for which attorneys in the public defender's office previously represented the witnesses. Accordingly, no conflict has arisen under rule 32:1.9, and Larson and Lauber are not prohibited under the rule from representing McKinley, even without the witnesses' consent. *See* Lowenthal, 93 Yale L.J. at 57 ("[I]f the relationship between the earlier representation and the foreseeable issues in the case before the court is not particularly strong, the risk of an ethical violation is small and the defendant's choice of counsel should prevail.").

Because we conclude there is no actual conflict or serious potential for conflict in this case, we need not decide whether a potential conflict arising from Eimermann and Russell's past representations of the three witnesses must be imputed to Larson and Lauber.[6]

---

[6]Conflict-of-interest rules are less strict for lawyers who serve as public officers or government employees. *See* Iowa R. Prof'l Conduct 32:1.11 cmt. [2] ("Because of the special problems raised by imputation within a government agency, [rule 32:1.11] paragraph (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees . . . ."). On two occasions, we have indicated the public defender's office may be a firm for conflict-of-interest purposes, rather than a government agency. *Watson*, 620 N.W.2d at 241 ("[A]ll members of the Public Defenders Office were bound to protect [the witness]'s confidences and secrets. Thus, . . . co-counsel labored under the same conflict of interest . . . ."); *see also Smith*, 761 N.W.2d at 72 (describing *Watson* by unequivocally stating "both of Watson's defense attorneys were members of the same firm (the public defender's office)"). On the other hand, in *Smitherman* we phrased imputation in hypothetical terms, expressing no opinion about whether the entire public defender's office was required to withdraw when one individual public defender was required to do so. *Smitherman*, 733 N.W.2d at 348 & n.8. We noted "several authorities recognize that different rules should govern the imputation of conflicts

**D. Lack of Temporal Overlap or Attorney Overlap.** Because our rules of professional conduct are not alone dispositive on the question of whether a serious potential for conflict exists, we also consider whether the disqualification ordered by the district court is justified under applicable caselaw. As we have noted, neither Larson nor Lauber represented Rouse, Hickman, or Manuel. Thus, this case is much different from *Watson* or *Smitherman*, in which both the defendant and the witness were concurrently represented by the same individual

_____

among government lawyers," leaving open the question whether public defenders are in fact government lawyers. *Id.* at 348 n.8.

Our research reveals courts confronting this question in other states are divided. For example, Colorado public defenders are deemed government lawyers under the Colorado Rules of Professional Conduct. Accordingly, conflicts of interest are not imputed throughout an entire office in that jurisdiction. *See People v. Shari*, 204 P.3d 453, 459 (Colo. 2009). Similarly, in Connecticut, public defenders are not considered "members of the same firm." *See Anderson v. Comm'r of Corr.*, 15 A.3d 658, 665 (Conn. App. Ct. 2011). On the other hand, Georgia and Maryland treat each public defender office for a particular circuit, county, or district as a private firm. *In re Formal Advisory Op. 10-1*, 744 S.E.2d 798, 799 (Ga. 2013) (per curiam); *Duvall*, 923 A.2d at 93–95. Additionally, some states eschew a per se rule in favor of a flexible case-by-case approach, evaluating the facts of each case individually when determining whether the public defenders involved in the case work in a firm or as government lawyers. *See, e.g.*, *State v. Severson*, 215 P.3d 414, 421, 426–27 (Idaho 2009); *Bolin v. State*, 137 P.3d 136, 145 (Wyo. 2006). Notably, both McKinley and the State expressly asserted we should resolve this case on grounds other than whether Larson and Lauber are properly classified as government lawyers under rule 32:1.11. Accordingly, because we conclude there is no actual conflict or potential conflict requiring the disqualification of Larson and Lauber in this case, we accept the parties' suggestions and leave this issue for another day.

Furthermore, given our conclusion that the potential conflict does not require or justify disqualification under the circumstances presented here, it is appropriate to defer a decision on whether public defenders are government attorneys under our conflict-of-interest rules until we confront a case in which it might be dispositive. *State v. Mark*, 231 P.3d 478, 516 (Haw. 2010) (concluding that because the court found no conflict at all, "the question of whether [the office of the public defender] acted as 'a single firm' for purposes of this case need not be addressed"); *see also State v. Sustaita*, 902 P.2d 1344, 1347 & n.2 (Ariz. Ct. App. 1995) (recognizing "[i]t can be argued that . . . imputed disqualification[] does not apply to the public defender's office," but declining to reach the issue because there was no conflict necessitating withdrawal or disqualification); *cf. Smitherman*, 733 N.W.2d at 348 n.7 (finding a waiver issue moot in light of our ultimate conclusion).

attorney for at least a short time. *See Smitherman*, 733 N.W.2d at 343; *Watson*, 620 N.W.2d at 235; *see also State v. Cook*, 171 P.3d 1282, 1290–91 (Idaho Ct. App. 2007) (stressing representation by different attorneys within the public defender's office as an important factor mitigating any potential conflict); Brown, 31 U.S.F. L. Rev. at 17 ("The fact that a . . . witness was formerly represented by a different attorney in the same public defender office representing the accused is unlikely to dampen the commitment of the accused's attorney.").[7]

Further, no attorney employed in the same public defender's office *concurrently* represented McKinley and the three witnesses listed by the State. Instead, the public defenders' representations of the witnesses and McKinley is successive. Thus, this case is much different from *Smith*, in which two different attorneys from the same firm represented the defendant and a witness at the same time. *See Smith*, 761 N.W.2d at 66 (noting the witness "was *at that time* represented by . . . Montgomery's colleague" (emphasis added)). The fact there is no temporal overlap or attorney overlap in this case bolsters our conclusion that on this record, no conflict is likely to arise and McKinley's choice of counsel should be given effect.

Indeed, this case is analogous in important respects to our decision in *Nichol v. State*, 309 N.W.2d 468, 470 (Iowa 1981). There, we said:

> Taylor was the state's principal witness. [Defense counsel] had represented him in a civil matter . . . a year or so before the trial of this case. He did not represent Taylor at the time of trial. This single isolated representation of Taylor on a

---

[7]This case is also distinguishable from our recent decision in *State v. Vaughan*, ___ N.W.2d ___ (Iowa 2015). In *Vaughan*, as in *Watson* and *Smitherman*, the same individual attorney concurrently represented the defendant and a witness. *Id.* at ___.

> wholly unrelated matter does not raise even a remote possibility of conflict. There is no showing of any probability of future business . . . . Neither is there anything about that case which suggests [defense counsel] obtained any privileged information which would inhibit his representation of [Nichol].

*Id.* (internal quotation marks omitted); *see also Flynn*, 87 F.3d at 1001 ("The mere fact that a trial lawyer had previously represented a prosecution witness does not entitle a defendant to relief."); *Pippins*, 661 N.W.2d at 546 ("[The attorney]'s earlier representation of the witness, Hillman, was not a 'conflict' . . . ."). As in *Nichol*, we conclude on this record the public defenders' prior representations of Rouse, Hickman, and Manuel on unrelated matters raises no serious possibility of conflict precluding Larson and Lauber from representing McKinley.

We also find support for our conclusion in numerous cases from other courts in which an attorney's colleague previously represented a witness and the court found no disqualifying conflict in a subsequent criminal case. *See, e.g., United States v. Jeffers*, 520 F.2d 1256, 1259–60, 1266 (7th Cir. 1975); *United States v. Reynoso*, 6 F. Supp. 2d 269, 270–71 (S.D.N.Y. 1998); *Lech*, 895 F. Supp. at 590; *United States v. Judge*, 625 F. Supp. 901, 902–03 (D. Haw. 1986); *People v. Shari*, 204 P.3d 453, 458 (Colo. 2009); *Bouie v. State*, 559 So. 2d 1113, 1115 (Fla. 1990) (per curiam); *State v. Severson*, 215 P.3d 414, 421, 426–27 (Idaho 2009); *State v. Hunsaker*, 873 P.2d 540, 546 (Wash. Ct. App. 1994); *State v. Anderson*, 713 P.2d 145, 148 (Wash. Ct. App. 1986). These cases further strengthen our conclusion that Larson and Lauber can zealously represent McKinley at trial.

### V. Conclusion.

The district court's decision disqualifying Larson and Lauber based primarily on an erroneous application of provisions of the Iowa Rules of

Professional Conduct constitutes an untenable ground for the court's exercise of discretion. Under the relevant caselaw and our rules of professional conduct, the prior representations of witnesses in unrelated matters by other members of the public defender's office did not present an actual conflict or a serious potential for conflict that justifies the order disqualifying Larson and Lauber and countermanding McKinley's interest in continuing an attorney–client relationship.[8] We reverse the disqualification order and remand for further proceedings.

**REVERSED AND REMANDED.**

All justices concur except Waterman and Mansfield, JJ., who concur specially.

---

[8]We emphasize that our decision is based on the present record. If upon remand the district court is made aware of new evidence or grounds tending to establish Larson and Lauber's representations of McKinley is adversely affected by their former colleagues' representation of the witnesses on unrelated matters, further proceedings addressing the potential conflict may be had.

**WATERMAN**, **Justice (concurring specially).**

I concur with the result of the majority opinion reversing the district court order that disqualified the entire Des Moines adult public defender's office from representing Lavelle McKinley on his murder charge. I agree there is no conflict or potential conflict arising from the fact several witnesses had previously been represented on unrelated charges by other public defenders in this office with screening procedures in place to prevent misuse of confidential information. I write separately because the majority misses the opportunity to settle the recurring legal issue: whether an individual public defender's conflict of interest is automatically imputed to the entire public defender's office. The answer to that question should be "no."

Public defenders represent most felony defendants in this state. Witnesses and victims often have their own criminal histories. The public defenders are salaried state employees and experienced trial lawyers who exercise individual independent judgment defending their clients. The district court erred by automatically imputing conflicts from one public defender to the entire office, including the two experienced attorneys McKinley wanted to retain. The automatic imputation issue was decided below and briefed by the State on appeal.[9] We should follow

---

[9]The State in its appellate brief argued against automatic imputation of the conflicts of an individual public defender to disqualify the entire office. The State acknowledged the split in authority in other jurisdictions and that the district court order disqualifying McKinley's counsel could be reversed without deciding the automatic-imputation rule. The majority's reluctance to decide the issue today is based in part on the appellate public defender's failure to brief the issue or take a position in this case. Parties desiring a resolution to this recurring issue in future cases should make an appropriate record in district court and fully brief the issue there and on appeal.

the well-reasoned decisions of other courts applying equivalent rules of professional conduct that decline to automatically impute conflicts of interest of an individual public defender to others in the same office. Specifically, we should hold that the public defender's office is not a "firm" within the meaning of Iowa Rule of Professional Conduct 32:1.10 and that public defenders are "government lawyers" within the meaning of Iowa Rule of Professional Conduct 32:1.11. Concerns arising from prior or concurrent representations by other public defenders in the same office can be resolved through screening procedures.

### I. Analysis.

This issue requires analysis of the interplay between several of the Iowa Rules of Professional Conduct, patterned after the American Bar Association model rules.[10] Iowa rule 32:1.7(a) prohibits an attorney from representing a client if doing so "involves a concurrent conflict of interest." Iowa R. of Prof'l Conduct 32:1.7(a).

> A concurrent conflict exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

*Id.* r. 32:1.7(a)(1)–(2). Rule 32:1.9 prohibits an attorney "who has formerly represented a client in a matter [from] represent[ing] another

---

[10]The Iowa Rules of Professional Conduct on conflicts of interest are identical in relevant part to the ABA Model Rules of Professional Conduct. Iowa Rule 32:1.7 corresponds with ABA Model Rule 1.7; Iowa Rule 32:1.9 corresponds with ABA Rule 1.9; Iowa Rule 32:1.10 corresponds with ABA Rule 1.10, although ABA Rule 1.10 contains additional provisions regarding screening; and Iowa Rule 32:1.11 corresponds with ABA Rule 1.11. *Compare* Iowa Rs. of Prof'l Conduct 32:1.7, 1.9, 1.10, 1.11, *with* Model Rules of Prof'l Conduct rs. 1.7, 1.9, 1.10, 1.11 (2009).

person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." *Id.* r. 32:1.9(a). The rule also provides:

> A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer was formerly associated had previously represented a client
>
> (1) whose interests are materially adverse to that person, and
>
> (2) about whom the lawyer had acquired information protected by [the rules of confidentiality] that is material to the matter . . . .

*Id.* r. 32:1.9(b)(1)–(2). Rule 32:1.10 is Iowa's imputation requirement, providing that

> [w]hile lawyers are associated *in a firm,* none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by rule 32:1.7 or 32:1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

*Id.* r. 32:1.10(a) (emphasis added). Finally, Iowa rule 32:1.11 excludes government lawyers from the imputation requirements of rule 32:1.10(a) by explicitly subjecting them only to rules 32:1.7 and 32:1.9. *See id.* r. 32:1.11(d)(1) ("Except as law may otherwise expressly permit, a lawyer currently serving as a public officer or employee . . . is subject to rules 32:1.7 and 32:1.9 . . . .").

To automatically impute the conflict of one public defender to the entire public defender's office requires two determinations: (1) the public defender's office is a "firm" under rule 32:1.10, and (2) a public defender is not "a lawyer serving as a public officer or employee" under rule 32:1.11. Neither determination should be made here. The better-

reasoned decisions have rejected the automatic imputation of the conflicts of one public defender to the entire office. *See United States v. Reynoso*, 6 F. Supp. 2d 269, 271–72 (S.D.N.Y. 1998) ("[I]t does not make sense to apply to the Federal Defender Division[] the same standards for disqualification that would apply to a private law firm" and noting "[t]he American Law Institute has also recognized that imputed disqualification . . . should not automatically apply to public defender offices"); *People v. Shari*, 204 P.3d 453, 459 & nn. 5–6 (Colo. 2009) (holding that a public defender's office is not a firm under the imputation rule and that public defenders are government attorneys); *Anderson v. Comm'r of Corr.*, 15 A.3d 658, 664 (Conn. App. Ct. 2011) (holding that a public defender's office is not a firm and that "the plain language of rules 1.10 and 1.11 supports the respondent's contention that [public defenders are government attorneys]"); *State v. Severson*, 215 P.3d 414, 426–27 (Idaho 2009) (holding that a public defender's office is not a firm for purposes of imputation and adopting a case-by-case approach); *People v. Miller*, 404 N.E.2d 199, 202 (Ill. 1980) (rejecting "the notion that a public defender's office is to be treated as a law firm or 'entity' in considering a conflict of interest claim"); *Bartley v. Commonwealth*, 400 S.W.3d 714, 719–20 (Ky. 2013) (utilizing a case-by-case approach to determine whether a conflict should be imputed within the public defender's office); *State v. St. Dennis*, 244 P.3d 292, 298 (Mont. 2010) (holding that a public defender's office is not equivalent to a firm and adopting case-by-case approach); *State v. Bell*, 447 A.2d 525, 528–29 (N.J. 1982) (noting the differences between firms and public defender's offices); *Asch v. State*, 62 P.3d 945, 953 (Wyo. 2003) (rejecting "automatic disqualification of assistant public defenders" because the public defender's office is not equivalent to a firm).

Other courts apply an automatic-imputation rule to public defenders. *See, e.g., Okeani v. Super. Ct.*, 871 P.2d 727, 729 (Ariz. Ct. App. 1993) ("The conflict of interest is not alleviated by the fact that defendant and the victim were represented by different lawyers within the Public Defender's Office."); *Bouie v. State*, 559 So. 2d 1113, 1115 (Fla. 1990) ("As a general rule, a public defender's office is the functional equivalent of a law firm."); *In re Formal Advisory Op. 10-1*, 744 S.E.2d 798, 799–800 (Ga. 2013) (per curiam) (concluding "that Rule 1.10(a) applies to a circuit public defender office as it would to a private law firm," but noting imputing conflicts "imposes real costs on Georgia's indigent defense system"); *In re Hoang*, 781 P.2d 731, 735–36 (Kan. 1989) (noting the disqualifying conflict of one public defender was imputed to an entire office); *Duvall v. State*, 923 A.2d 81, 95 (Md. Ct. Spec. App. 2007) (stating that "at a minimum, each district office of the public defender should be treated as a private law firm for conflict of interest purposes"); *Richards v. Clow*, 702 P.2d 4, 6 (N.M. 1985) (limiting imputation of conflicts to public defenders within the judicial district or county rather than statewide); *Commonwealth v. Westbrook*, 400 A.2d 160, 162 (Pa. 1979) ("[T]he Public Defenders Association of Philadelphia is a 'law firm[.]'"); *State v. Hunsaker*, 873 P.2d 540, 542 (Wash. Ct. App. 1994) ("[P]ublic defender agencies qualify as 'law firms' for the purposes of application of the [professional conduct] rules."); *see also* Restatement (Third) of the Law Governing Lawyers § 123 cmt. d(iv), at 289 (2000) (explaining that the "rules on imputed conflicts and screening of [the] Section apply to a public-defender organization as they do to a law firm in private practice in a similar situation"). Significantly, only one of these cases acknowledged the conflicting authority in other jurisdictions. *See Duvall* 923 A.2d at 94 (stating that "jurisdictions remain divided on the

issue of how to treat public defender's offices during a conflict of interest analysis"). The other cases merely cite the rules or that state's precedent without analysis.

In an unpublished opinion, our court of appeals applied the automatic-imputation rule:

> We have no trouble concluding that the public defender's office had a conflict of interest due to their concurrent representation of Brown, a witness adverse to Ibarra's interests, and the past representation of Wilson, the victim.[4] Although Valorie Wilson and Jennifer Russell had not previously represented Brown or Wilson, the conflict of other members of the public defender's office was imputed to them. *See* Iowa Rs. Prof'l Conduct 32:1.7 and 32:1.10.

*State v. Ibarra*, No. 12–0330, 2013 WL 530558, at *8 (Iowa Ct. App. Feb. 13, 2013) (footnote omitted). The *Ibarra* court did not address Iowa Rule of Professional Conduct 32:1.11 or survey the decisions from other jurisdictions. Our court should decide the question in a precedential opinion.[11]

Courts take different paths to the conclusion that an individual public defender's conflict should not be automatically imputed to the entire office. Some courts arrive at this outcome by explicitly refusing to equate public defender's offices to firms under ABA Model Rule 1.10 without addressing the government lawyer issue. Others reach both issues. I will address each issue in turn.

---

[11]We expressly left open the question in *State v. Smitherman*, 733 N.W.2d 341, 348 & n.8 (Iowa 2007) (citing authorities concluding the automatic-imputation rule does not apply to public defenders or government lawyers generally). Several other opinions, in dicta, suggest that public defenders are subject to the same rules as private law firms, but those cases were discussing the former rules. *See State v. Watson*, 620 N.W.2d 233, 241 (Iowa 2000) (citing Iowa Code of Prof'l Responsibility EC 4-2).

**A. The Public Defender's Office Is Not Like a Private Law Firm.**  The comments to ABA Model Rule 1.10 (Imputation of Conflicts of Interest) provide that:

> For purposes of the Rules of Professional Conduct, the term "firm" denotes lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation or other organization.

Ellen J. Bennett, et al., *Annotated Model Rules of Professional Conduct* 178 (2011) [hereinafter Bennett].  The commentators omitted public defender offices or any government office or agency from the enumerated organizations falling under the definition of "firm."  The same comment, with the same omission, accompanies the Iowa rule.  *See* Iowa R. of Prof'l Conduct 32:1.10 cmt. 1.  The ABA annotations also explain that "[a] government law office is also ordinarily considered a 'firm' for purposes of the ethics rules . . . , *but the imputation of conflicts in government law offices is regulated by Rule 1.11 rather than Rule 1.10.*"  Bennett at 181 (emphasis added).  These comments indicate the drafters of the ABA Model Rules and Iowa rules never intended for public defenders to be subject to the automatic imputation of conflicts of interest.  The better-reasoned decisions interpreting the model rules have held public defender's offices are not firms for purposes of imputing conflicts.

The Montana Supreme Court distinguished public defender's offices from private law firms as follows:

> In deciding upon the approach to be taken in OPD [Office of Public Defender] conflict of interest cases, we consider among other factors the unique nature of public defender offices as opposed to private law firms.  Unlike private law firms, the OPD is a not-for-profit public entity with a single source of clients engaged in a single type of legal proceeding.  The OPD does not solicit clients or accept referrals from the public.  Moreover, the attorneys are

salaried employees rather than participants in the profits and revenue generated by a law firm. As such, their compensation is not driven by their success or failure.

*St. Dennis*, 244 P.3d at 297–98 (citation omitted). The Wyoming Supreme Court elaborated on the differences between public defenders and lawyers in private law firms:

> [P]ublic defenders who are subject to a common supervisory structure within an organization ordinarily should be treated as independent for purposes of [imputing conflicts of interest]. The lawyers provide legal services, not to the public defender office, but to individual defendants. Ordinarily, the office would have no reason to give one defendant more vigorous representation than other defendants whose interests are in conflict. Thus, while individual defendants should be represented by separate members of the defender's office, the representation of each defendant should not be imputed to other lawyers in an office where effective measures prevent communications of confidential client information between lawyers employed on behalf of individual defendants.
>
> Similarly, there is no financial incentive for attorneys in a public defender's office to favor one client over another. The public defender does not receive more money if one client prevails and another does not. An assistant public defender, as a salaried government employee, simply does not have the financial interest in a case that is inherent in private practice.

*Asch*, 62 P.3d at 953 (citations omitted) (internal quotation marks omitted). The Idaho Supreme Court reached the same conclusion:

> "[A]utomatically disqualifying a public defender where another attorney in the office has a conflict of interest would significantly hamper the ability to provide legal representation of indigent clients. This, together with the fact that such concurrent representation by public defenders generally will create no incentive (economic or otherwise) for diminished advocacy in such cases, convinces us that a *per se* rule imputing conflicts of interest to affiliated public defenders is inappropriate where there is no indication the conflict would hamper an attorney's ability to effectively represent a client."

*Severson*, 215 P.3d at 426 (quoting *State v. Cook*, 171 P.3d 1282, 1292 (Idaho Ct. App. 2007)). As noted above, the cases imposing an

automatic-imputation rule by treating public defender offices like private law firms did so without analysis.

The automatic-imputation rule also increases the burden on taxpayers. When an entire public defender's office is disqualified, private contract attorneys must be paid at hourly rates or a distant public defender must be brought in with attendant travel time and expense. The *Asch* court observed:

> [I]t goes without saying that an experienced public defender who specializes in criminal defense is a valuable asset within the criminal justice system, especially to the indigent defendant. Furthermore, given Wyoming's many small communities, with a limited number of lawyers, it could be difficult in many cases even to find local counsel for a defendant.
>
> [Another] reason to avoid an automatic disqualification rule for imputed conflicts of interest among assistant public defenders is fiscal. Paying outside counsel every time there are multiple defendants in a case would, no doubt, be quite an expense for the taxpayers of the state. Where there has been no showing of an actual conflict of interest, and thus no showing of prejudice to the defendants, the minimal benefit of a *per se* rule would not justify the additional expense. While we cannot and should not "put a price on" the legal representation we provide to indigent defendants, the judicial branch of government still has an obligation to be fiscally responsible.

62 P.3d at 953–54. The same court also addressed the concern that substitute counsel may be less experienced and less competent:

> Another reason to adopt a case-by-case inquiry for conflicts of interest within the State Public Defender's Office is that to do otherwise would needlessly jeopardize the right of individual defendants to skilled and competent representation. As noted by the Illinois Supreme Court, "[i]n many instances the application of such a *per se* rule would require the appointment of counsel with virtually no experience in the trial of criminal matters, thus raising, with justification, the question of competency of counsel."

*Id.* at 953 (quoting *People v. Robinson*, 402 N.E.2d 157, 162 (Ill. 1979)).

These decisions are persuasive and should be followed. The concerns outlined by these state supreme courts are raised in the case before us. McKinley, facing life in prison, chose to continue with his experienced trial lawyers from the Des Moines adult public defender's office rather than proceeding with a less-experienced lawyer from the juvenile public defender's office. Moreover, in many areas of the state, disqualification of the resident public defender's office requires appointment of private contract attorneys or public defenders located farther away and at greater expense.

The best way to ensure that defendants receive conflict-free counsel while preventing the unnecessary disqualification of public defenders is by adopting a screening process sufficiently thorough to protect against the concerns giving rise to the imputation requirement. The *Shari* court outlined Colorado's screening process, which the court found sufficient to assuage "any concerns regarding the communication of confidential information from the public defenders who previously represented the prosecution's witnesses . . . ." 204 P.3d at 459. There is no reason screening policies would not work equally well in Iowa.

**B. Public Defenders Are Government Attorneys.** While excluding public defender offices from the definition of firm under the Iowa Rules of Professional Conduct is sufficient to avoid automatic imputation, I also believe that public defenders are "lawyer[s] currently serving as . . . public officer[s] or employee[s]" within the meaning of Iowa Rule of Professional Conduct 32:1.11 and are thereby exempted from automatic imputation for that additional reason. Both the Colorado Supreme Court and the Connecticut Court of Appeals came to the same conclusion. *Shari*, 204 P.3d at 459; *Anderson*, 15 A.3d at 664. As the *Shari* court explained:

> Conflicts particular to individual lawyers within a firm can, in certain circumstances, be imputed to the entire firm. However, Rule 1.10 specifically states that [t]he disqualification of lawyers associated in a firm with former or current government lawyers is governed by Rule 1.11. Rule 1.11, in turn, subjects government lawyers to Rules 1.7 and 1.9. The comments to Rule 1.11 make clear that a government attorney's individual conflicts are not imputed to the entire government agency for which he works. In accordance with Rule 1.11, we have recognized that a distinction must be drawn between an attorney in private practice with a traditional law firm and an attorney associated with a large public or governmental agency.

204 P.3d at 459 (footnotes omitted) (citations omitted) (internal quotation marks omitted). *Shari*'s facts mirror the case before us.[12]

Like Colorado, Iowa excludes from imputation "a lawyer currently serving as a public officer or employee." Iowa R. Prof'l Conduct 32:1.11. Using the plain language of Iowa provision, it is evident that public defenders are included within this definition. Public defenders are salaried employees paid by the state. Accordingly, a public defender is a "lawyer currently serving as a public . . . employee." *Compare* Colo. R. of Prof'l Conduct 1.11, *with* Iowa R. of Prof'l Conduct 32:1.11(d). As such, they are governed by Iowa Rule of Professional Conduct 32:1.11 and excluded from the imputation requirements of rule 32:1.10.[13]

---

[12]*Shari* involved a defendant charged with several counts of murder who had been assigned two defense attorneys from the public defender's office. 204 P.3d at 455. After a date for the initial hearing was set, "the People filed a motion for conflict-free counsel," alleging "that the entire Office of the State Public Defender . . . should be disqualified from representing [the defendant] because of the Office's prior representation of the People's three primary witnesses against [the defendant]." *Id.* Although the trial court "recognized that neither [of the attorneys] was individually involved in any of the three witnesses' cases," the court nonetheless disqualified the attorneys "because other attorneys within the Public Defender's Office had represented the witnesses." *Id.* at 455–56.

[13]The comments to the rule support this interpretation. Iowa R. of Prof'l Conduct 32:1.11 cmt. [2] ("Because of the special problems raised by imputation within a government agency, paragraph (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees, although ordinarily it would be prudent to screen such lawyers."); Model Rule of Prof'l Conduct r. 1.11 cmt. [2] (same).

It is disappointing the majority today fails to take the opportunity to settle this recurring legal question. Until the automatic-imputation issue is resolved by court decision or rule amendment, our trial courts will continue to struggle case-by-case with public defender intraoffice conflicts. Sadly, unnecessary disqualifications will continue. The practical consequences often will be increased taxpayer expense and defendants who proceed with substitute counsel instead of counsel of their choice.

Mansfield, J., joins this special concurrence.